**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:24-cv-3013

ANTONIO JONES, an individual,

     Plaintiff,

v.

UNITED AIRLINES, INC,

     Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Antonio Jones, through his counsel, Tyrone Glover, Helen Oh, and Genevieve Mesch of TYRONE GLOVER LAW, respectfully alleges for his Complaint and Jury Demand:

**I. INTRODUCTION**

1. Plaintiff Antonio Jones is an African-American man, and worked as a Ramp Service Lead for United Airlines, Inc. ("United") at Denver International Airport. Throughout his employment, Mr. Jones was recognized for his excellent performance.

2. During his tenure with United, Mr. Jones experienced a racially hostile work environment—he witnessed a noose placed in an employee breakroom, was harassed based on his race by a white lead employee and was disproportionately disciplined by his non-Black Supervisors.

3. When Mr. Jones reported his discriminatory treatment, he was retaliated against by his Supervisors who repeatedly disciplined him for using profanity, something which other non-Black employees were not disciplined for. Mr. Jones also experienced a retaliatory hostile work

environment in which his supervisors repeatedly set him up for failure by assigning him impossible tasks, and then disciplining him based on his failure to complete those tasks.

4.     This hostile work environment escalated until Mr. Jones was discharged on January 27, 2023.

5.     United's discriminatory discharge of Plaintiff based on his race, its perpetuation of a hostile work environment, and its unlawful retaliation against him after he complained of discriminatory treatment, is a violation of Title VII of the Civil Rights Act of 1964, as amended, ("Title VII"), 42 U.S.C. § 2000e, *et seq.,* and the Colorado Anti-Discrimination Act ("CADA"), C.R.S. § 24-34-401, *et seq.*

## II.     JURISDICTION AND VENUE

6.     This action is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.*  Jurisdiction of this Court is invoked under 28 U.S.C. §§ 1331 and 1343.

7.     Jurisdiction supporting Plaintiff's claims for attorney's fees and costs is conferred by 42 U.S.C. §§ 2000e-5(k).

8.     Venue is proper under 28 U.S.C. § 1391 because the employment practices alleged to be unlawful occurred in the District of Colorado.

## III.  ADMINISTRATIVE PREREQUISITES

9.     Plaintiff timely filed a Charge of Discrimination with the Colorado Civil Rights Division ("CCRD") and the U.S. Equal Employment Opportunity Commission ("EEOC"), CCRD Charge No. E2400022233 and EEOC Charge No. 32A-2024-00176, and has received his notice of right to sue.  Thus, all administrative prerequisites have been met.

## IV.  PARTIES

2

10.     At all relevant times, Mr. Antonio Jones was a resident of and domiciled in the State of Colorado and was an employee of United Airlines, Inc. located at the Denver International Airport. Mr. Jones is an African-American man, and is a member of the class of persons protected by Title VII and CADA.

11.     Defendant United Airlines, Inc. (hereinafter, "United") is an international airline incorporated in Delaware with its corporate headquarters in Chicago, IL, that has been continuously doing business in the State of Colorado.

## V.     STATEMENT OF FACTS[1]

12.     Mr. Jones began his employment with United in early February 2019 as a Ramp Service Employee. Mr. Jones was also a member of United's union, the International Association of Machinists and Aerospace Workers.

### A. Mr. Jones was an Outstanding Ramp Service Employee

13.     Mr. Jones was an extremely diligent, dedicated, and dependable worker.

14.     Mr. Jones worked an average 112 hours a week because he was assigned to mandatory overtime, often working 16-hour days back-to-back. At one point Mr. Jones worked mandatory overtime for three months straight without a day off.

15.     United recognized Mr. Jones's stellar work and dedication by promoting him to a Ramp Service Lead within four months of his start day, on June 5, 2021.

---

[1] Facts are alleged upon information and belief, unless stated otherwise.

3

**B. United Maintained a Culture of Anti-Black Racism and Harassment, While Protecting Those Accused of Discriminatory Conduct**

16. When Mr. Jones was hired, United employed approximately 4,500 people at DIA alone. United has significantly expanded its operations at DIA over the last three years, and in 2022, hired another 1,500 people to work at DIA.

17. Mr. Jones estimates that less than 1% of the company's ramp agents were Black, and 2% of the company's Leads were Black.

18. During his tenure with United, Mr. Jones experienced a culture of discrimination in which Black employees were disproportionately scrutinized, investigated, and disciplined, particularly those who spoke out against mistreatment.

19. Jessica Chase, a former United Ramp Service Lead and Supervisor of Airport Operations with United, recalls supervisors making statements like, "I can't wait to get him," or "he's going to shoot himself in the foot, just wait for it," about Black Ramp Service Employees. In contrast, this was not the norm for their white and Latino counterparts, who generally received a slap on the wrist for any violations compared to their Black counterparts.

20. While United would go to great lengths to investigation misconduct by Black employees, the Company would fail to reasonably investigate allegations of racial harassment and retaliation made by Black employees.

21. Around December 2020, Mr. Jones went into the breakroom that is commonly used by Black employees to clock in for his shift.

22. There was commotion because a noose was found on a table.

23. Manager Nick Jurkowski was present and saw the noose.

24. Other managers whose names Mr. Jones did not know were also present. Union Manager Bill Stef was notified.

25. However, there was no action taken by United as a result of this incident.

## C. Mr. Jones Experienced Harassment Based on His Race and Endorsed by His Supervisors

26. In or around January of 2021, Mr. Jones had a racist encounter with a white male supervisor, Antonio Milic, and a white male ramp service lead.

27. On that morning, Mr. Milic falsely accused Mr. Jones of being late to work when he was not scheduled to work until 8:30am. Mr. Milic called Mr. Jones on the telephone over 30 times in advance of his 8:30 shift start time. When Mr. Jones arrived on time for his 8:30 a.m. shift and told Mr. Milic to look at the schedule to verify his start time, Mr. Milic refused.

28. Mr. Milic then ordered Mr. Jones to work an assignment with a white male lead who had a reputation for being racist and who had been the subject of numerous complaints of discriminatory behavior. Mr. Milic was aware of these complaints as the supervisor of this lead.

29. This lead was later terminated for calling another employee the N-word.

30. Mr. Jones followed Mr. Milic's order and worked with this lead, who was condescending, disrespectful, made multiple inappropriate comments about Black people, and ordered him around like a child. Mr. Jones completed his assigned tasks, remained calm and requested that the lead speak to him respectfully like an adult. However, the lead continued to belittle Mr. Jones. Mr. Jones then tried to highlight the inappropriate and racist nature of the lead's behavior by responding to an order by saying, "yes master." The lead responded by immediately telling Mr. Jones that he would be fired.

31. The lead then called Mr. Milic. When Mr. Milic arrived Mr. Jones explained to him how the lead was being racist and told Mr. Milic that this treatment was "bullshit."

32.     Mr. Milic exploded at Mr. Jones and also told him that he was fired. Mr. Milic then aggressively grabbed Mr. Jones's airport badge, causing the attached pull cord to snap back and strike Mr. Jones in the neck.

33.     At this point, other employees nearby spoke up to tell Mr. Milic that Mr. Jones had done nothing wrong and that the lead was the one had been out of line. Mr. Milic ignored them and then threatened to call the police on Mr. Jones and told him that he would go to jail.

34.     Mr. Jones felt extremely unsafe, so he grabbed his backpack and went to the parking lot.

35.     When he got to his car, Mr. Jones received numerous calls from the union supervisor Bill Stef and supervisor Lyssa Latu asking him to come back and talk to them, claiming that he was not fired.

36.     Mr. Jones went to Mr. Stref's office, where he and another union representative were present. Mr. Jones explained what had happened and detailed the racist treatment he had experienced from the lead.

37.     Mr. Stref told Mr. Jones that the same lead had been under investigation for numerous complaints of racist treatment of other Black employees. Mr. Stref also stated that Mr. Milic did not have the authority to terminate Mr. Jones without following United policy.

38.     Supervisor Latu and Mr. Milic then joined the meeting. During the meeting Mr. Milic was defensive, justifying his behavior by claiming that he and the lead thought Mr. Jones was late that morning—despite the fact that he was not, and they could have verified that by checking the schedule.

39.     Supervisor Latu made assurances to Mr. Jones that they would investigate what had occurred. However, no action was ever taken and no one followed up with Mr. Jones about this incident.

40.     Mr. Milic indisputably violated numerous company policies, including assaulting Mr. Jones with his badge, improperly terminating him without proper procedure, screaming at him and treating him with extreme disrespect in front of other employees, and making racist threats of calling the police on him and stating he would go to jail. Despite the magnitude of these infractions and the harm caused to Mr. Milic, United chose not to further investigate or discipline Mr. Milic, and intentionally made no written record of what occurred.

41.     Mr. Jones later learned that Mr. Milic was promoted to manager.

## D. Mr. Jones Experienced a Discriminatory and Retaliatory Hostile Work Environment Perpetrated by his Supervisors

42.     After this incident, Mr. Milic repeatedly went out of his way to closely scrutinize Mr. Jone's work and to watch him like a hawk. Mr. Milic scrutinized Mr. Jones at a level far beyond that of other employees, particularly other non-Black employees.

43.     Mr. Jones felt that Mr. Milic was waiting for an opportunity to discipline Mr. Jones as retaliation for objecting to the racist treatment that he had experienced.

44.     Mr. Jones reported Mr. Milic's conduct to Kenneth Brown, a United Executive, who dismissed his concerns and told him that Mr. Milic was probably just doing his job.

45.     United also had notice of Mr. Milic's discriminatory behavior because another Black Ramp Agent, William Smith had complained of discrimination and whistleblower retaliation by Mr. Milic in January 2021 to human resources, management, and the union.

46.     Upon information and belief, nothing was done to address Mr. Smith's complaints.

7

47.    In early February 2021, Mr. Jones was in the break room about to clock out at the end of his shift when Mr. Milic entered the room and assigned him to mandatory overtime on the spot, with the shift to start immediately that evening.

48.    Mr. Jones was exhausted and frustrated, as he had already worked mandatory overtime every single day for nearly three months straight.

49.    During this conversation, Mr. Jones was holding his work and personal cellphone, one in each hand, and he threw up his hands in frustration. When he did so, his personal phone slipped out of his hand, fell to the floor, and cracked. Mr. Milic immediately told Mr. Jones he was writing him up for throwing company property. Mr. Jones assured Mr. Milic that the phone he had dropped was his personal cellphone, which he certainly did not intend to damage.

50.    Mr. Jones then went and worked the overtime shift he had been assigned without issue.

51.    However, during his shift, Mr. Milic wrote Mr. Jones up.

52.    A few days later, the union representative Mr. Stef told Mr. Jones that he was under investigation and was required to meet with management on February 7, 2021, after his shift.

53.    After the conclusion of his shift on February 7, 2021, Mr. Jones was on his way to the meeting, when he was stopped by supervisor Karem Valdez, a white woman. Supervisor Valdez assigned him to an overtime shift on the spot, which would start immediately. Mr. Jones explained that he had a meeting with management he needed to attend, but Ms. Valdez insisted that he needed to work this trip because they were short-staffed.

54.    Mr. Jones therefore completed the trip as Ms. Valdez ordered. Immediately after the assignment, Mr. Jones went to the manager's office to explain what had happened. The

manager there was a white woman who he did not know, and she said that they would look into it. Mr. Jones did not hear anything further about the meeting.

55.     Subsequently, a written warning dated March 26, 2021,[2] and authored by Mr. Milic was placed in Mr. Jones's personnel records, stating that Mr. Jones had met with him in the conference room on February 7, 2021, with union shop steward DeWayne Reed, and that Mr. Jones had been counseled that his performance was below expectations regarding respect and professionalism because Mr. Jones had used profanity—using the word "bullshit"—and because Mr. Jones had thrown his phone to the ground in the presence of others.

56.     There are multiple reasons to believe that this written warning is not authentic— the written warning was not signed by Mr. Jones, was not on United letterhead like other written discipline, and the signature by Mr. Milic was oddly dated April 9, 2021. Most importantly, Mr. Jones was not at this meeting and did not learn about the written warning on his record until he was disciplined again, nearly a year later, on April 10, 2022.

57.     Further, using cusswords is commonplace among United Ramp Employees, and upon information and belief, no similarly situated non-Black employees were disciplined for using profanity.

58.     In spite of the increasingly hostile work environment, Mr. Jones's continued to perform his job exceptionally well, and on June 5, 2021, he received a promotion to Lead Ramp Agent.

---

[2] The date on which this written warning was actual placed in Mr. Jones's personnel file is unclear, and it is possible that it was manufactured later and post-dated, in order to comply with the progressive discipline requirements of the Collective Bargaining Agreement. This is supported by the fact that Mr. Jones was promoted shortly after purportedly receiving this warning, despite the fact that United maintains that employees are not eligible for promotion or transfer while under a performance-based warning.

59.    After this, Mr. Jones made efforts to try and stay off of management's radar to avoid further hostile treatment, including by moving from the main line to express, and working on Concourse A.

### E. United Supervisors Escalate the Retaliatory and Discriminatory Hostile Work Environment

60.    Unfortunately, Mr. Jones continued to be disciplined and treated more harshly than other non-Black employees.

61.    Mr. Jones was repeatedly set up for failure by his non-Black Supervisors, who assigned him tasks that would be impossible to complete, and then disciplined him for alleged non-cooperation.

62.    For example, in March of 2022, while working a shift, Mr. Jones was tasked to work an assignment by a Latino supervisor, Oscar Lucero. When Mr. Jones arrived at the gate, he saw that the plane was a wide-body flight which he did not have the proper training or qualifications to lead. Mr. Jones called Mr. Lucero to inform him that he was not qualified to work the assignment as he did not have the proper training—a fact that was easily verifiable within United's system.

63.    Mr. Lucero responded that he gave Mr. Jones a full crew to help complete the task and hung up. Mr. Jones called again and explained that he did not have the qualifications to work a wide-body flight, which was met with frustration and insistence that he complete the assignment anyway.

64.    Mr. Jones respectfully refused because he was not adequately trained, while reiterating that a qualified lead was needed to complete the job. In the meantime, Mr. Jones and the crew completed the tasks they had the authority to perform, and then waited at the gate for help to arrive.

10

65. Because the flight was delayed by close to an hour and a half due to this issue, several other supervisors came to the gate and quickly verified that Mr. Jones's did not have the proper qualifications or training to complete the assignment.

66. Mr. Jones was then informed by Manager Mimi Tiedemann that Mr. Lucero had made a complaint against him for his refusal to complete the assignment.

67. Despite confirming the veracity of Mr. Jones's position, Mr. Lucero was not disciplined, and Ms. Tiedemann chalked it up as "a mistake."

68. Mr. Jones expressed his disbelief at management's starkly differential treatment toward and discipline of Mr. Lucero compared to Black employees, like Mr. Jones, and explicitly stated to Ms. Tiedemann that "this has to be a color thing."

69. United did not request any written statements from the parties involved and conducted no further investigation into this incident.

70. Subsequently, on April 10, 2022, Mr. Jones, was on a gate assignment with a white male ramp agent who was the acting supervisor on the assignment. The ramp agent pulled up in a golf cart and asked Mr. Jones if everything was good. Mr. Jones responded, "yeah, its all cool," and proceeded to put his cell phone up to his ear, as he was finishing a conversation with his son.

71. The ramp agent then drove off in the other direction, only to sharply turn around and almost hit Mr. Jones with the golf cart. The manner in which the ramp agent was driving the cart led Mr. Jones to believe that the near miss was intentional.

72. The ramp agent then parked the cart in the middle of the plane pull-in area, which was unauthorized and a safety hazard. Appalled and shaken by almost being run over, Mr. Jones yelled out at the ramp agent to "get the fuck off the gate" and to "leave me alone," as it was obvious the man was trying to bully or intimidate him,

11

73.     Mr. Jones then reported this incident to Assistant Manager Nick Jurkowski and a union representative, Jason Sohn, both white males.

74.     They held a meeting that day—but instead of focusing on the ramp agent's reckless and dangerous conduct, they interrogated Mr. Jones about using profanity. He candidly told them that he had used those words, because he was shaken due to the ramp agent attempting to hit him with the cart. Mr. Jones also reiterated that the ramp agent had illegally and unsafely parked the cart in the middle of the airplane pull-in area.

75.     On May 1, 2022, Mr. Jones was given a termination warning by Mr. Jurkowski for "failing to treat a coworker with dignity and respect," because Mr. Jones had used profanity. To his knowledge, the white ramp agent driving the cart was neither warned nor disciplined.

76.     During this meeting with Mr. Jurkowski, Mr. Jones was also informed for the first time about the written warning Mr. Milic had apparently placed in his personnel file.

77.     Soon thereafter, on June 22, 2022, Supervisor Karem Valdez called Mr. Jones to assign him to a last-minute mandatory overtime assignment at the end of Concourse B.

78.     At the time, Mr. Jones was working on Concourse A and would have had only twenty minutes to get to his assignment on the other side of the airport.

79.     Mr. Jones told Ms. Valdez that he would not be able to make it there on time, and that he was not the most junior lead in the work area, so pursuant to the collective bargaining agreement, another lead should be assigned to the trip.

80.     Ms. Valdez instructed him to take a cart and drive there to save time, but Mr. Jones told her that taking a cart would violate the airport rules, and he could not do so. Ms. Valdez encouraged him to take the cart anyway and stated that Mr. Jones must complete this assignment. Ms. Valdez then hung up on Mr. Jones.

81. When Mr. Jones called back, the phone was answered by Supervisor Jose Meija. After Mr. Jones explained the situation, he then transferred the call back to Ms. Valdez for further clarification.

82. Jose Mieja later told Assistant Manager Drew Cummings that Mr. Jones had been calm and respectful on the phone.

83. When Mr. Jones spoke with Ms. Valdez the second time, he continued to maintain a calm and reasoned tone. She told him he needed to complete the assignment, to which he explained he had seniority so a more-junior lead should be assigned, that supervisors did not do this with other leads, and that he believed this treatment of him was racist. Ms. Valdez once again hung up on Mr. Jones.

84. Ms. Valdez later complained to Mr. Cummings that she was upset because "this was a long-standing issue," and front-line employees were allowed to be "disrespectful" to supervisors.

85. Mr. Jones did not want to risk a violation, so he did not use the cart. Instead, he ran across the airport on foot and fortunately was able to arrive for the assignment just in time.

86. While he was running, Mr. Jones also called Mr. Cummings and reported to him that he believed he was being assigned discriminatorily and wished to meet with a supervisor.

87. When he arrived to the gate at Concourse B, Mr. Jurkowski was there and Mr. Jones told him that he had just come over from Concourse A and was instructed to rush over for this assignment. Mr. Jones completed the assignment with no issues.

88. However, Mr. Jurkowski then informed Mr. Jones that he had received a message that Mr. Jones needed to report to the office.

89.     When Mr. Jones went to the office with Mr. Jurkowski, Supervisor Latu and Assistant Manager Drew Cummings were present. Supervisor Latu informed Mr. Jones that Ms. Valdez had reported him for missing his assignment—the same one that he had just completed.

90.     Mr. Jurkowski, who had seen Mr. Jones complete the assignment asked that the managers pull the surveillance footage. However, Supervisor Latu declined to do so.

91.     Mr. Jurkowski and Mr. Cummings then left the meeting, but Supervisor Latu continued to question Mr. Jones. Mr. Jones requested that a union shop steward be present for the meeting, as is his right, but Ms. Latu denied his request.

92.     Ms. Latu then told Mr. Jones that Ms. Valdez had not only alleged that he had missed the assignment, but that he had yelled at her and used foul language during the phone conversation. Mr. Jones denied that had happened.

93.     After this meeting, Mr. Cummings spoke candidly with Mr. Jones and warned him that "they are trying to paint you as the bad guy. Watch yourself with Lyssa [Latu], she plays a dirty game."

94.     Several days later, on June 26, 2022, Mr. Jones received a notification from United that Ms. Valdez had assigned him as ramp lead for two flights that were scheduled five minutes apart and that he was the only qualified plane pusher available for the assignments. Mr. Jones called Ms. Valdez to clarify whether this was an error—because it could not possibly be accomplished. The assignment was also outside Mr. Jones's overtime hours, meaning that United would be at risk of liability in the event that he got injured.

95.     At the direction of Ms. Valdez, Mr. Jones called Sariah Massey in scheduling.

96.     Ms. Massey told him that she needed to put him on hold to research the issue and to call Ms. Valdez. To expedite the process, Mr. Jones offered to come to the office to show Ms.

14

Massey the confirmation of his shift swap on his phone. She told him that the doors to the office were already closed, although the scheduling staff were still present in the office physically. Mr. Jones said that he had the code, and again offered to stop by the office. Ms. Massey repeated that the office was closed and hung up on him.

**F. United Conducted a Biased, Bad Faith Investigation and Discriminatorily and Retaliatorily Discharged Mr. Jones**

97. On July 5, 2022, Mr. Jones was suspended while United investigated his alleged violations of workplace policies.

98. In October and December 2022, United held Investigatory Review Meetings with Mr. Jones and United management who recommended his termination for engaging in unprofessional and inappropriate behavior.

99. During this process, Mr. Jones' numerous complaints of disparate treatment, discrimination, and retaliation at the hands of Ms. Valdez, Ms. Latu, Mr. Milic, and Mr. Lucero were never investigated.

100. The Notification of the Investigative Review Hearing stated that the proposed termination was based on his failure to "display dignity and respect while interacting with ROC Supervisor Karem Valdez," that he had "used foul language during the phone interaction," and that he had lied about having any conversations with Ms. Massey.

101. The Notice also stated that these failures are just the latest in a long history of similar behavior, and specifically cited to the March 26, 2022, Written Warning from Mr. Milic, and the May 1, 2022, Termination Warning.

102. During the investigation, Mr. Jones had never denied speaking with Ms. Massey on the phone.

15

103.    Further, the second call with Ms. Valdez, in which he allegedly used foul language, was oddly not recorded—despite the fact that all of the other calls were recorded per United practice.

104.    On or around January 26, 2023, his suspension was lifted. The next day, January 27, 2023, Mr. Jones was terminated effective immediately. Mr. Jones subsequently appealed his termination, but on April 19, 2023, the termination was upheld.

### G.  Mr. Jones was Treated Disparately from Similarly Situated Non-Black Employees at United

105.    During Mr. Jones tenure with United, it was commonplace for ramp employees to use profanity.

106.    Upon information and belief, numerous white ramp agents and leads used profanity in the workplace and were not disciplined, let alone terminated.

107.    Further, other white ramp agents and leads committed far more serious infractions and were not terminated or disciplined.

108.    Mr. Milic was never disciplined for his treatment of Mr. Jones—including when he yelled at him that he would call the police and go to jail, when he falsely told him he was fired, and when he aggressively grabbed his badge.

109.    The white lead who attempted to hit Mr. Jones with the golf cart was never investigated or disciplined.

110.    When Mr. Lucero and Ms. Valdez encouraged Mr. Jones to violate airport rules or to perform tasks that he was not qualified for, they were not investigated or disciplined.

111.    When Mr. Lucero improperly assigned Mr. Jones to perform a task he was not qualified for, leading to a flight being significant delayed, he was not disciplined or investigated.

16

112.    In 2021, Mr. Jurkowski backed a company vehicle into another company vehicle, resulting in significant damage. Mr. Jurkowski refused to take a drug test after this incident. However, Manager Jacob Chong did not enforce the drug test requirement and swept the incident under the rug. Mr. Jurkowski was not investigated or disciplined.

113.    Mr. Jones was disciplined far more harshly than other non-Black employees at United, and was forced to endure a retaliatory and discriminatory hostile work environment that escalated until he was discharged.

114.    As a result of United's discriminatory actions, Mr. Jones has suffered and will continue to suffer substantial injuries, damages, and losses.

### STATEMENT OF CLAIMS FOR RELIEF

**FIRST CLAIM FOR RELIEF**
**Hostile Work Environment Because of Race and Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.***

115.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

116.    Plaintiff, an African American man, is a member of a protected class on the basis of race.

117.    Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

118.    The offensive conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Mr. Jones.

119.    The harassment and hostile work environment to which Mr. Jones was subjected was based on his race and was perpetrated by managers for United who had actual authority over Mr. Jones.

17

120.    United knew or should have known of the hostile work environment because United supervisors and managers observed it, because the harassment was frequent and notorious in nature, and because Mr. Jones complained about it to Supervisors on multiple occasions.

121.    United failed to take prompt or effective action to prevent, correct, or remedy the work environment that was hostile for Mr. Jones.

122.    The effect of the practices complained of above has been to deprive Mr. Jones of equal employment opportunities and to adversely affect his status as an employee based on his race.

123.    The unlawful employment practices were intentional and were done with indifference to Mr. Jones's federal protected rights.

124.    As a direct and proximate result of these unlawful employment practices Mr. Jones has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

**SECOND CLAIM FOR RELIEF**
**Race Discrimination**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e,** *et seq.*

125.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

126.    Plaintiff, an African American man, is a member of a protected class on the basis of race.

127.    Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

128.    Plaintiff was subject to an adverse employment action when United terminated his employment.

18

129.    United engaged in race discrimination against Plaintiff by treating him less favorably than non-Black employees who engaged in similar conduct.

130.    United engaged in race discrimination against Plaintiff by disproportionately disciplining and investigating him for rule violations, while treating other non-Black employees more favorably.

131.    Plaintiff's race was the motivating factor in Defendant's taking adverse employment action against Plaintiff.

132.    Defendant's asserted reasons for taking adverse employment action against Plaintiff was mere pretext for illegal discrimination and did not actually motivate such actions.

133.    As a direct and proximate result of these unlawful employment practices Mr. Jones has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

### THIRD CLAIM FOR RELIEF
**Retaliation**
**Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.***

134.    Plaintiff incorporates all allegations in this Complaint as though fully set forth herein.

135.    Plaintiff believed in good faith that United discriminated against him on the basis of his race.

136.    Plaintiff engaged in activities and speech opposing discrimination by reporting the disproportionate discipline that he was receiving as discriminatory, and reporting that Ms. Valdez's treatment was based was based on his race.

137.    Because of Plaintiff's opposition to his discriminatory treatment, Defendant subjected him to materially adverse treatment by repeatedly placing him in impossible work conditions, disproportionately disciplining him, and eventually discharging him.

138.    Defendant engaged in unlawful retaliation against Plaintiff pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

139.    Defendant's retaliation against Plaintiff arose out of, was caused by, and was like and related to the race discrimination Plaintiff opposed.

140.    Defendant's retaliation against Plaintiff was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

**FOURTH CLAIM FOR RELIEF**
**Hostile Work Environment Based on Race and Retaliation**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.**

141.    Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

142.    Plaintiff, an African American man, is a member of a protected class on the basis of race.

143.    Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

144.    The offensive conduct described in the preceding paragraphs was sufficiently severe or pervasive to alter the terms and conditions of employment for Mr. Jones.

145.    The harassment and hostile work environment to which Mr. Jones was subjected was based on his race and was perpetrated by managers for United who had actual authority over Mr. Jones.

146. United knew or should have known of the hostile work environment because United supervisors and managers observed it, because the harassment was frequent and notorious in nature, and because Mr. Jones complained about it to Supervisors on multiple occasions.

147. United failed to take prompt or effective action to prevent, correct, or remedy the work environment that was hostile for Mr. Jones.

148. The effect of the practices complained of above has been to deprive Mr. Jones of equal employment opportunities and to adversely affect his status as an employee based on his race.

149. The unlawful employment practices were intentional and were done with indifference to Mr. Jones's protected rights under Colorado Law.

150. As a direct and proximate result of these unlawful employment practices Mr. Jones has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

### FIFTH CLAIM FOR RELIEF
**Race Discrimination**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.**

151. Plaintiff incorporates all paragraphs of this Complaint as though fully set forth herein.

152. Plaintiff, an African American man, is a member of a protected class on the basis of race.

153. Plaintiff was, and has at all relevant times been, qualified to perform his job responsibilities as a United employee, and performed his job in highly effective manner.

154. Plaintiff was subject to an adverse employment action when United terminated his employment.

21

155.    United engaged in race discrimination against Plaintiff by treating him less favorably than non-Black employees who engaged in similar conduct.

156.    United engaged in race discrimination against Plaintiff by disproportionately disciplining and investigating him for rule violations, while treating other non-Black employees more favorably.

157.    Plaintiff's race was the motivating factor in Defendant's taking adverse employment action against Plaintiff.

158.    Defendant's asserted reasons for taking adverse employment action against Plaintiff was mere pretext for illegal discrimination and did not actually motivate such actions.

159.    As a direct and proximate result of these unlawful employment practices Mr. Jones has been deprived of equal employment opportunities, and suffered humiliation, degradation, emotional distress, other consequential damages, and lost wages.

**SIXTH CLAIM FOR RELIEF**
**Retaliation**
**Colorado Anti-Discrimination Act, C.R.S. § 24-34-402.**

160.    Plaintiff incorporates all allegations in this Complaint as though fully set forth herein.

161.    Plaintiff believed in good faith that United discriminated against him on the basis of his race.

162.    Plaintiff engaged in activities and speech opposing discrimination by reporting the disproportionate discipline that he was receiving as discriminatory, and reporting that Ms. Valdez's treatment was based was based on his race.

22

163.    Because of Plaintiff's opposition to his discriminatory treatment, Defendant subjected him to materially adverse treatment by repeatedly placing him in impossible work conditions, disproportionately disciplining him, and eventually discharging him.

164.    Defendant engaged in unlawful retaliation against Plaintiff pursuant to its custom, policy, or practice to take materially adverse actions against employees who voiced opposition to discrimination or harassment based on race.

165.    Defendant's retaliation against Plaintiff arose out of, was caused by, and was like and related to the race discrimination Plaintiff opposed.

166.    Defendant's retaliation against Plaintiff was the direct and proximate cause of Plaintiff's injuries, damages, and losses.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court enter judgment in his favor and against Defendant, and award him all relief as allowed by law, including, but not limited to:

a.    Declaratory relief and injunctive relief, as appropriate;

b.    Actual economic damages, including, but not limited to, front pay and back pay damages, as established at trial;

c.    Compensatory damages, including, but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses;

d.    An award of punitive damages because Defendant engaged in intentional discrimination and has so done with malice or reckless indifference to Plaintiff's federally protected rights;

e.    Pre-judgment and post-judgment interest at the highest lawful rate;

23

    f.   Attorney's fees and costs; and

    g.   Such further relief as justice requires.

**PLAINTIFF ANTONIO JONES HEREBY DEMANDS TRIAL BY JURY PURUSANT TO FEDERAL RULE OF CIVIL PROCEDURE 38(b) ON ALL ISSUES SO TRIABLE.**

Respectfully submitted this 28th day of October 2024.

TYRONE GLOVER LAW, LLC

*s/ A. Tyrone Glover*
A. Tyrone Glover
Helen Oh
Genevieve Mesch
2590 Walnut Street
Denver, CO 80205
303-577-1655
helen@tyroneglover.com
tyrone@tyroneglover.com
genevieve@tyroneglover.com

*Attorneys for Plaintiff*